GEORGE G. CAREY, JR., ADMINISTRATOR, *v.*
SAFE DEPOSIT AND TRUST COMPANY, TRUSTEE.
[Nos. 57-60, January Term, 1935.]

*Decided April 12th, 1935.*

The causes were argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Edgar Allan Poe, Jr.,* with whom were *Bartlett, Poe & Claggett* on the brief, for the appellant.

*Frederick J. Singley,* with whom were *Hinkley, Hisky & Burger* on the brief, for the appellee.

MITCHELL, J., delivered the opinion of the Court.

This case embraces three appeals in one record from decrees entered in the Circuit Court No. 2 of Baltimore City, and one appeal from a decree entered in the Circuit Court of Baltimore City, involving four separate trust estates, in which the late George G. Carey was sole trustee, and in which the Safe Deposit & Trust Company of Baltimore is now substituted trustee. For a more convenient reference in this opinion to each of the above appeals, we deem it expedient to set forth at the outset the titling of each trust, with a brief statement of the origin and nature thereof, and their status at the time of the death of Mr. Carey, and to designate them by consecutive numbers, 1, 2, 3, and 4, in the respective order in which they are hereinafter stated.

Case No. 1: Rena Trust et al. v. Rena S. Beacham. Appeal from Circuit Court No. 2 of Baltimore City. The funds of this case represent reinvestments of portions of the estate of Edwin H. Trust, given to his wife for life, and after her death to his children for life. On the death of his children the trust estate becomes the absolute property of his grandchildren. The fourth clause of his will reads as follows: "I authorize and empower my wife to sell, lease, assign or otherwise dispose of by deed or lease or other instrument of writing any part or all of that half of my estate which is given to her for life, in case she may deem it desirable or necessary to do so, and to reinvest the proceeds thereof in such safe securities as she may deem proper, upon and for the same uses as are hereinbefore mentioned with reference to the said half of my estate, and so that the purchasers or lessees shall not be bound to see to the reinvestment of the said proceeds." The twenty-sixth rule report filed in the year 1932 by Mr. Glenn shows a deposit of $2,058.63 in the Title Guarantee & Trust Company in the name of Carey

& Glenn. The ledger of Carey & Glenn shows uninvested corpus as follows:

| | |
|---|---:|
| November 29, 1929 | $1,500.00 |
| May 29, 1930 | 1,650.00 |
| July 29, 1930 | 1,120.00 |
| March 24, 1931 | 2,050.00 |
| July 21, 1932 | 3,025.00 |

George G. Carey was appointed trustee on August 2nd, 1930, and duly qualified. At the time of his death, the value of the principal of the trust estate was approximately $15,000. During the course of the administration of the trust estate, the trustee deposited funds belonging to this estate in the savings department of the Title Guarantee & Trust Company, in an account standing in the name of Carey & Glenn. On March 24th, 1931, there was in this account, representing funds of this trust estate, the sum of $2,050, and on July 21st, 1932, this amount was increased, by a deposit of funds pertaining to this estate, to the sum of $3,025; the amount due by the trustee to the trust estate at the time of his death being the sum of $3,014.63. In addition to the trust funds above mentioned, there were deposited from time to time in the account in the savings department of the trust company in the name of Carey & Glenn other trust funds and certain funds held by Carey & Glenn, or George G. Carey, as agents, and also some of the individual funds of Carey & Glenn. There never was a time when the amount of the funds in the account did not exceed the sum total of the trust funds and the agency funds. Following the death of George G. Carey, George G. Carey, Jr., was appointed administrator of the estate of his father, and duly qualified. On the 9th day of February, 1933, George G. Carey, Jr., as administrator, deposited in the savings department of the trust company $3,014.63 to the credit of Trust v. Beacham; the said amount representing the amount of the funds belonging to said trust estate which had been deposited as above mentioned in the account in the savings department of the Title Guarantee & Trust Company, in the name of Carey & Glenn. This sum of $3,014.63 was drawn from

the Carey & Glenn savings account, deposited in the checking account of Carey & Glenn, in the Baltimore Trust Company, and redeposited the same day in the savings department of the Title Guarantee & Trust Company to the credit of the trust estate of Trust v. Beacham. The affairs of the Title Guarantee & Trust Company were placed in the hands of the state bank examiner as receiver on February 17th, 1933.

Case No. 2: Mary Elizabeth White v. Ernault H. Williams. Appeal from Circuit Court No. 2 of Baltimore City. In a deed from Mary Elizabeth White and Stevenson White, her husband, to George Hawkins Williams as trustee, dated April 3rd, 1871, Mary Elizabeth White conveyed her property to the trustee in trust to pay her the income for life, and at her death reserving a right to dispose of the property by last will and testament, and, on failure to exercise this power of appointment, the trust property to be conveyed to the children of Mary Elizabeth White. On the death of George Hawkins Williams, Stevenson White was appointed trustee for his wife. On the death of Mr. White, George G. Carey was appointed trustee on September 15th, 1923. The property of Mrs. White consisted chiefly of her residence in Howard County, which was sold, and the proceeds of sale were reinvested for her benefit. The account with the Title Guarantee & Trust Company was opened February 9th, 1933. The ledger sheet of Carey & Glenn shows that the estate consisted originally of two mortgages, one of $4,000 and one of $3,500, and was fully invested in 1926. At the time of Mr. Carey's death, the value of the principal of the trust estate was approximately $8,800. During the course of the administration of this estate, the trustee deposited funds pertaining thereto in the savings department of the trust company in the name of Carey & Glenn; the amount of funds pertaining to this trust estate, as of May 31st, 1930, being the sum of $1,407.94, which sum was in said account at the time of the trustee's death. The facts with reference to the manner in which the funds in this estate were deposited, the sufficiency at all

times of the credit to the account of Carey & Glenn to cover the sum total of all trust and agency funds carried therein, the subsequent withdrawal, by the administrator of the estate of the trustee, of the amount properly due this estate from the said account of Carey & Glenn, its subsequent deposit in the Baltimore Trust Company, and redeposit on the same day in the savings department of the Title Guarantee & Trust Company to the trust estate of White v. Williams, are in every respect similar to those set forth in the trust estate of Rena Trust et al. v. Rena S. Beacham. In February, 1924, the firm of Carey & Glenn received a commission of $100 in connection with an investment in a six per cent mortgage of $4,000; and again, in December, 1926, the same firm received a commission of $87.50 in connection with an investment in a six per cent mortgage of $3,500 in the administration of the trust fund in this case.

Case No. 3: Ex parte, in the matter of the trust estate under the will of Marita Weems, for Agnes M. Woollen. Appeal from the Circuit Court No. 2 of Baltimore City. The funds in this case arose under the will of Maria Weems, recorded in Anne Arundel County. The funds were deposited in the Title Guarantee & Trust Company, passbook No. 68, which dates back to 1920. Mr. Carey was appointed trustee on September 24th, 1930. At the time of his death, the value of the principal of the trust estate was approximately $112,000. During the course of the administration of the trust estate, the trustee deposited trust funds in the name of the trust estate in the savings department of the Title Guarantee & Trust Company, and from time to time made withdrawals from said account. As a result thereof, there were the following balances on the following dates:

| | |
|---|---|
| August 1, 1931 | $17,804.87 |
| October 1, 1931 | 17,931.26 |
| October 28, 1931 | 17,804.87 |
| January 14, 1932 | 7,804.87 |
| March 31, 1932 | 8,012.12 |
| April 1, 1932 | 8,236.12 |

| | |
|---|---|
| April 8, 1932 | 8,012.12 |
| September 1, 1932 | 8,258.12 |
| October 1, 1932 | 8,399.01 |
| October 5, 1932 | 8,258.12 |

this last amount being also the amount on deposit at the time of the trustee's death. The difference of $10,000 between the balance as of October 28th, 1931, and the balance as of January 14th, 1932, was due to the fact that in January, 1932, the trustee withdrew $10,000 from the account and invested it in a first mortgage at six per cent. In connection with this mortgage, commissions of $250 were paid to the law firm of Carey & Glenn, of which Mr. Carey was the sole member.

Case No. 4: Marion E. Trust v. Rena Trust et al. Appeal from the Circuit Court of Baltimore City. The trust fund in this case arose originally out of the sale to Mr. Jacob Epstein of the property No. 216 West Baltimore street. A bill was filed in the above entitled cause for the sale of the property, and Marion E. Trust was appointed trustee. Under the will of Jacob Trust, the testator left the estate to his son for life, with remainder to his daughters. On March 11th, 1915, Marion E. Trust was relieved of her duties and John Glenn, Jr., succeeded her. On June 7th, 1930, John Glenn, Jr., was relieved as trustee, and George G. Carey was appointed trustee on September 24th, 1930, and duly qualified. At the time of his death, the value of the principal of the trust estate was approximately $54,000. The amount originally deposited to the credit of this estate in the savings department of the Title Guarantee & Trust Company was the sum of $5,075.74, which amount varied from time to time only slightly until between the dates of May 2nd, 1932, and August 3rd, 1932, when the deposit appears to have been then reduced to the sum of $1,998.50 by a withdrawal by the trustee of the difference, for the purpose of investment in a six per cent. first mortgage to the credit of this estate. In connection with this investment, a commission of $100 was paid the law firm of Carey & Glenn, of which said trustee was sole member; the balance on deposit to the

credit of the above account, at the time of the death of the trustee, being the said sum of $1,998.50.

The bill of complaint in each of the foregoing cases alleges, in substance, the appointment and qualification of Mr. Carey as trustee: his deposit, from time to time, of uninvested cash principal in the savings department of the Title Guarantee & Trust Company, without complying with the requirements of Rule 22 of the Circuit Courts of Baltimore City: his subsequent death on December 8th, 1932, and the appointment of the substituted trustee in the respective courts under which the trusts are being administered; the appointment of George G. Carey, Jr., as administrator of the estate of George G. Carey: the personal estate of the said George G. Carey being $39,405.40, with separate debts amounting to $48,700: and the solvency of said estate. It further alleges that the respective claims have been filed against the estate of George G. Carey in the Orphans' Court of Baltimore County, the situs of the administration of his estate: that the administrator has advised the claimant that its claim is disputed, and disclaimed any liability for the amount thereof; that the suit is being brought under the order of the court under which the trust is being administered; and, finally, each bill prays that a decree may be passed directing the administrator of George G. Carey to pay to the substituted trustee the respective uninvested amounts due, as hereinbefore set forth; and for general relief.

Rule 22 of the Circuit Courts of Baltimore City is as follows: "Moneys and Securities Brought into Court. All moneys or securities brought into court under any order thereof shall be deposited in such national bank or trust company of the City of Baltimore as the court may direct, to the credit of the cause wherein such order shall have been passed, and there remain subject to the order of the court. The original order signed by the judge of the court, together with the check of the clerk, in the usual form, shall be the authority of the bank or trust company for the payment of the money or delivery of a security deposited as aforesaid. The clerk shall procure a suit-

able check or pass-book, in which shall be entered, under the appropriate head, all sums and securities deposited, and all sums and securities checked out. It shall also be his duty to record in said book the order of the court and his own check, by virtue of which any money or security may be withdrawn and the receipt for such order and check, which shall be signed by the person to whom the same shall be delivered and at the time of the delivery. All checks shall be drawn payable to the order of the person or persons to whom such payment or delivery is directed to be made, or to the counsel of record. And whenever it shall appear probable that the moneys in the hands of any trustee, receiver, committee, or other officer of the court, or under its jurisdiction, will remain in his hands undisturbed for a period above ninety days from the receipt thereof, such officer shall, upon such receipt, report to the court the amount of such receipt or receipts, and the probable time that the same will remain undistributed, and thereupon the court shall make such order with respect to the disposition thereof as to it shall seem proper."

The answer of the respondent, which is similar in each case, except, of course, as to the amount involved, admits the several matters set forth in the bill of complaint, but nevertheless justifies the action of the trustee in noncompliance with Rule 22, above quoted, for the reason that ever since 1929 the judges of the two Circuit Courts of Baltimore City have refused to direct trustees of trust estates, administered under the jurisdiction of said courts, where to deposit money in their hands, or to designate the bank or financial institution in which said trustees should deposit trust funds, thereby placing upon the trustees themselves the duty and responsibility of deciding in which banks or financial institutions such funds should be deposited. The answer further sets forth the fact that the respondent's decedent fully complied, from time to time, with Rule 26, applicable to the Circuit Courts of Baltimore City, and regularly made reports thereunder in accordance therewith: that said reports showed of what

the trust estate in the hands of the trustee consisted, and correctly set forth the amount of cash in the hands of the trustee, and where the same was deposited, namely, in the savings department of the Title Guarantee & Trust Company; that said reports were regularly and duly referred by order of court to an auditor and master of the court for examination and report, and were passed upon and approved by said auditor and master; and that the equitable life tenants were aware, through notices sent them by the trustee, that the cash in the hands of the trustee was on savings deposit in said company, and no protest or objection of any kind was ever made by them to the trustee because of the depository.

The case was heard upon bill, answer, and testimony, the learned chancellor decreeing the amount claimed in each case against the estate of George G. Carey, deceased, with interest thereon at the rate of three per cent. per annum from February 17th, 1933, and that, upon compliance with said decree, the estate of the deceased trustee be subrogated to all of the rights of the substituted trustee to the respective deposit accounts in the Title Guarantee & Trust Company. It is from these decrees that the several appeals in this record are taken.

Briefly, the legal questions involved in these several cases may be grouped as follows:

(1) What liability, if any, devolves upon the estate of George G. Carey for permitting the trust funds pertaining to the trust estates under case designations 1 and 2 to be commingled with other trust and agency funds in the hands of said trustee, and with individual funds of said trustee, and carried on deposit in the firm name of Carey & Glenn; the amount to the credit of said account being at all times greater than the sum total of the trust funds and agency funds carried in said account?

(2) To what extent, if any, was the error of commingling cured by the unscrambling of trust funds in Cases 1 and 2, and their deposit by the administrator of the deceased trustee, under proper trust designation, in

the Title Guarantee & Trust Company, before the failure of said company?

(3) What liability, if any, devolves upon the estate of George G. Carey for having charged and received commissions in connection with mortgage loans of trust funds under his charge from borrowers of said funds, independent of compensation allowed him as trustee by order of court? It might be added that this question involves commission collections as follows: Case No. 2, $187.50; Case No. 3, $250; Case No. 4, $100.

(4) What liability, if any, devolves upon the estate of George G. Carey for permitting uninvested principal balances of all of the trust estates above designated to remain in the savings department of the Title Guarantee & Trust Company, although drawing interest at the rate of four per cent. down to June 1st, 1931, and thereafter at the rate of three and one-half per cent. per annum, for the respective periods shown by the record, all of which periods were more than ninety days?

(5) What liability, if any, devolves upon the estate of George G. Carey for his failure, as trustee, to comply with Rule 22 of the Circuit Courts of Baltimore City, as promulgated by the Supreme Bench of Baltimore City, under all the facts in these cases?

Queries Nos. 1 and 2 are directed to cases designated 1 and 2; query No. 3 is directed to cases designated 2, 3 and 4; and queries Nos. 4 and 5 are directed to all of the above cases.

We shall therefore dispose of these questions in the order above indicated.

It appears from the undisputed evidence in the record that George G. Carey, the late trustee, was for many years a member of the bar of Baltimore City, and that for the greater part of his professional life he was engaged in the practice of law with John Glenn, Jr., under the firm name of Carey & Glenn. In connection with the general practice of law, the firm engaged extensively in the administration of trust estates, and specialized in investments secured by six per cent. first mortgages on real estate. Some

time during the year 1930 Mr. Glenn retired from the firm; he being at the time of his retirement sole trustee in cases hereinbefore designated Nos. 1, 3, and 4.

It is conceded that Mr. Carey was a man of highest integrity and purpose, and that, in commingling the funds of two of the trust estates in his charge, he had no ulterior or selfish motive; hence his irregularity in this respect should, in no manner, be construed to reflect upon his integrity. Especially is this true when the record shows that at all times the amount of deposits of trust and agency funds, carried in the commingled account, was equal to the sum total of said trust and agency funds.

In 26 *R. C. L.* 1315, sec. 173, it is said: "A trustee must be careful to make the deposits in the name of the trust estate, and not to his personal credit, if he would avoid personal liability in case of failure of the bank. In such a case the good faith or intention of the trustee is in no way involved. * * * Having for his personal convenience, or from whatever motive, deposited the money in his own name, thereby vesting himself with a legal title, it follows as a necessary consequence, when a loss occurs, he will not be permitted to say, as against his *cestui que trust,* that the fact is not as he voluntarily made it appear. But the test is not so much the keeping of a separate account at the bank, as it is the parting with, and hence the losing of the identity of, the trust fund, and having in lieu thereof no obligation, contract or account on which is impressed the equitable ownership of the trust."

The principle that the deposit of funds in any name other than that of the trustee or fiduciary makes the trustee liable in the event of the failure of the depository is recognized by all authorities. The leading case on this subject in Maryland is found in that of *Jenkins v. Walter,* 8 G. & J. 218, in which a guardian, having received money belonging to his ward, deposited it in his own name, and by an indorsement on the certificate of deposit declared the property to be that of his ward, and that the property was placed in the bank for his ward's benefit. The court here held that, although the transaction was

fraught with the most upright intention and perfect good faith on the part of the guardian, it felt constrained to hold the guardian liable. In Cases 1 and 2, the fact that the ledger account of Carey & Glenn properly identified the trust funds on their books would make no difference.

Our conclusion, therefore, is that the mingling of the trust funds involved in Cases 1 and 2, by the trustee, was an irregularity which beyond question would have made his estate liable, had the deposits to the credit of these trust estates remained commingled down to the time of the failure of the trust company. As, however, this irregularity had been fully cured by deposits made by the administrator of the deceased trustee under proper trust designations, at the time of the failure of the trust company, we are of the opinion that no liability attaches to the estate of the trustee by reason of the former manner in which these deposits were carried.

Query No. 3 is directed to the matter of profit taking by a trustee in the administration of the trust. In *Perry on Trusts and Trustees*, vol. 1, sec. 429, it is said: "Trustees cannot make a profit from the trust funds committed to them, by using the money in any kind of trade or speculation, nor in their own business; nor can they put the funds into the trade or business of another, under a stipulation that they shall receive a bonus or other profit or advantage. In all such cases, the trustees must account for every dollar received from the use of the trust money and they will be absolutely responsible for it if it is lost in any such transactions."

The rule is that an agent cannot represent two principals having antagonistic interests, and that he cannot make a secret profit out of any transaction with his principal. This rule applies whether or not the interest or profit of the agent causes any loss to the principal. *De Crette v. Mohler*, 147 Md. 108, 127 A. 639.

In the recent case of *Mangels v. Tippett*, 167 Md. 290, 173 A. 191, 195, the late Judge Digges, after collating the authorities, quoted with approval from *Perry on Trusts and Trustees*, vol. 1, sec. 427, as follows: "Trustees hold

a position of trust and confidence. The legal title of the trust property is in them, and generally its whole management and control is in their hands. At the same time the beneficiaries of the trust may be women or children or persons incompetent to protect their own interests. For these reasons, to protect the weak and helpless on the one hand, and to prevent trustees from using their position and influence for their own gain, and to prevent them from hazarding the trust property upon what they may think to be profitable speculations, on the other, they are not allowed to make any profit from their office. They cannot use the trust property, nor their relation to it, for their own personal advantage. All the power and influence which the possession of the trust fund gives, must be used for the advantage and profit of the beneficial owners, and not for the personal gain and emolument of the trustee. No other rule would be safe; nor would it be possible for courts to apply any other rule, as between trustee and *cestui que trust.* A trustee will not be allowed to retain for himself a profit made from his dealings with trust property, although he is able to show that the profit was not made at the expense of the trust."

In *Lewin on Trusts and Trustees,* p. 275, the author states: "It is a general rule established to keep trustees in the straight line of their duty that they should not derive any personal advantage from the administration of the trust property." The same principal is also found in *Pomeroy's Equity Jurisprudence* (4th Ed.) vol. 3, sec. 1070, where it is said: "This rule is of wide application, and extends to every variety of circumstances."

It follows, therefore, from what we have said, that the estate of George G. Carey is chargeable with whatever amounts he may have collected by way of commissions or other private profit in the administration of his trusts; and this notwithstanding the apparent waiver of these charges by the solicitor for the complainant in the trial below.

The two remaining questions involved in these cases relate to the length of time in which the trust deposits were

permitted to remain on savings accounts and the noncompliance with Rule 22. In dealing with these questions, we quote from *Perry on Trusts and Trustees,* vol. 1, sec. 460 (a), as follows: "But unless the language of the trust instrument is mandatory, a trustee making investments within the extended field is not relieved from the responsibility of exercising the care and prudence which a reasonable man would exercise in making permanent investments for the purpose of insuring a steady income. A trustee who has been expressly directed or authorized by the trust instrument to invest at his discretion, or as he may think proper or best, must exercise the care and prudence usual with investors who are seeking to place their funds where they will be reasonably sure of the ultimate return of their principal and of a reasonable rate of income. He must not speculate for the purpose of increasing the principal nor invest in hazardous enterprises or upon security of speculative value for the purpose of getting an extra large income. His duty is to be measured by the usual conduct of a man of ordinary prudence making permanent investments of his own savings outside of ordinary business risks."

It must be remembered that the trustee was charged with the dual duty of serving both the life tenants and the remaindermen; and in doing this it was proper that he should make every effort to secure the best income possible to the life tenants, while at the same time guarding the corpus of the estate. A résumé of the amounts under the care and control of the trustee, as compared with the uninvested amounts in each case, is as follows:

|  | Corpus. | Uninvested. |
|---|---|---|
| Case No. 1 | $ 15,000.00 | $3,014.63 |
| Case No. 2 | 8,800.00 | 1,407.94 |
| Case No. 3 | 112,000.00 | 8,258.12 |
| Case No. 4 | 54,000.00 | 1,998.50 |

It will be observed from the above figures that comparative uninvested amounts in each estate are small; and the record shows that these uninvested amounts were on deposit in what the financial statement of the trust com-

pany in which they were placed showed to be a large and sound banking institution, with which the trustee and his firm had been dealing for many years. It is further shown that these uninvested funds were bearing interest at the rate of four per cent. or three and one-half per cent., which was regularly paid to the life tenants. It is true that they were deposited without the previous order of the Circuit Court; but in this connection the following statement from the chancellor below is quoted: "I will put that in the record: That this Court, in accordance with what it believes to be the policy of all other Judges of the Supreme Bench, declines to ever designate a depository for a fiduciary and leaves the selection of the depository of the funds of the trust to the intelligent selection of the fiduciary, on the theory that the designation of a particular bank as a safe place in which to deposit money would be a judicial act which, if intelligently exercised, would require the taking of testimony to ascertain the fact, and the Courts believe they have not either the equipment or the facilities for taking such testimony and ascertaining such fact, as it would vary from month to month and from day to day, and it declines to take that responsibility for lack of agencies to inform it. Therefore, I think it is the uniform practice in Baltimore City of the State Judges to designate no depository."

As stated before, the firm of Carey & Glenn specialized in real estate investments; and during the period in which these deposits remained in the trust company, the court is almost impelled to take judicial notice of the then existing economic condition, for the reason, it may be conservatively stated, that there never was a time in the history of the United States when it was more difficult to secure safe investments with a reasonable income. This statement applies, not alone to real estate investments, but to all classes of investment.

The record shows that during the greater part of the period in which the funds in these estates were kept on deposit in the trust company, namely, the years 1931 and 1932, United States government issues lacked stability on

the market, and in some instances large declines were recorded.

Rena Trust, a life tenant in Case No. 1, testified as follows: Q. "Do you recall having any conversation with Mr. George G. Carey the fall before his death? He died in December, 1932. A. Yes, I went to his office to sign a release for a mortgage which had been paid in, and then I did have a conversation with him, because he seemed to be rather concerned about financial conditions, and he said he thought it much wiser to have the money for the time being on deposit where it was growing. I am not sure whether it was 4% or 3½, they used to pay 4%, then they changed to 3½, until he could be sure of getting a safe investment for the amount."

It will be observed that the trustee was confronted with a condition and not a theory in the matter of securing investments which were desirable from the viewpoint of both safety and income, and for that reason kept his trust balances on deposit awaiting a more favorable investment situation. It is also shown that eighty-five per cent. of the trustee's approximate personal estate was invested in six per cent. first mortgages, or the same class of fixed security in which he sought to invest trust funds in his charge. These facts at least attest his good faith and sincerity of purpose.

In the very full opinion of the chancellor in this case, a number of authorities are collected dealing with the period in which a trustee may permit funds to remain on deposit. It would unnecessarily prolong this opinion to quote here from the many authorities which he has compiled. In many of these cases various periods of delay have been fixed as the time when or not the liability of the trustee attaches. It may be said that there is no fast rule in this regard; or, as better stated in *Clark's Estate*, 56 Pittsburg Legal Journal, 193: "A trustee may keep trust funds on deposit for a reasonable time while seeking an investment. The circumstances of each case determine what will be considered a reasonable time."

In *Miller's Equity Procedure*, sec. 7, it is said: "Rules of court are said to be necessary to the due administration of justice. The proper office of a rule is to establish a fixed and settled practice to. which the court is required to conform; a legitimate rule prescribes a law to the court. * * * There exists no discretion in an inferior court to dispense at pleasure with its own rules, or to innovate upon established practice. There may be, however, a certain discretionary power in the court to modify, vary or extend its rules in particular cases, but the limits of this power are not exactly defined."

In view of this well-recognized principle, we cannot and do not infer that the chancellor has ignored Rule 22 or any other rule of the court. What he has done is not to interpret the rule as placing upon the court the responsibility of designating the depository in which trust funds are to be deposited; and, in the light of such interpretation, we must conclude that, if the trustee had regarded Rule 22 as applicable to his several trusts, and had applied to the court to designate or select a depository, all the court would have done in the premises would have been to approve the depository then selected by the trustee, and in which all of the trust funds were at all times deposited; there being no business relations between the trustee and the Title Guarantee & Trust Company which would have caused the court to withhold its approval of the depository here selected.

Under the cardinal equitable maxims that "Equity regards that as done which ought to be done," and "looks to the intent, rather than to the form," we can find no injury, under all the facts in these cases, which the complainants have suffered through the mere omission to apply to the court for approval of the depository selected by the trustee; it being clearly shown that the court would have approved the selection of the same depository had application been seasonably made to it by the trustee.

In *McCrory v. Beeler*, 155 Md. 456, 461, 142 A. 587, 588, this court, speaking through Judge Sloan, said: "The court has the power to ratify the acts of a trustee done

for the benefit of those concerned without an application, if the court is of the opinion that such consent would have been forthcoming if requested." And in *Abell v. Brown*, 55 Md. 217, it is said: "Such is the settled practice in Maryland; the court does not hesitate to sanction what a trustee does in good faith for the benefit of the trust estate, whether he has or has not first applied to the court for authority." See, also *Perry on Trusts*, sec. 476.

What we have here said with reference to Rule 22 has been actuated by the fact that it is dealt with in the instant cases by counsel on both sides and by the chancellor as being controlling in the management of the trusts now under consideration. It is our opinion, however, that Rule 26 of the Supreme Bench of Baltimore City is designed to regulate the management of trust estates of the character now before us. This latter rule, under the caption of: "Accounting of Trustees, Receivers and other Fiduciaries" (in force at the time of the hearing below in these cases), in so far as the same deals with the management of trust estates under court directions, is as follows:

"In each year, on any day which may be fixed in a particular case by order of court, or, in the absence of such special order, then at the expiration of each period of twelve months dating from the order assuming jurisdiction of the trust or estate, it shall be the duty of every trustee, receiver, or other fiduciary executing or administering under the order and supervision of either of the said courts any trust, however created, or administering any estate thereunder, to file with the clerk of the said court by which he may have been appointed, or under the orders of which said trusts are or have been administered, a report or account, verified by his corporal oath, in which he shall fully and clearly set forth the nature of all the assets and property held by him in such fiduciary capacity, where any monies may be deposited, and under what name, and the nature and particulars of all securities, real or personal, whether the same were received by him in the same form as parts of the trust estate, or have been investments made by him.

"So soon as such report or account shall have been filed, it shall be the duty of the said clerk to so notify the trust clerk, and it shall then be the duty of the trust clerk to compare the said report with the last preceding report (if any). The trust clerk shall note on said report such securities, if any, referred to in the last.preceding report as are omitted in the report so filed, and after such comparison and making any such notation as may be required hereunder, the trust clerk shall lay the report before the judge of the court wherein the cause is pending, who shall thereupon refer the same back to the trust clerk, or to one of the auditors or masters for verification; and thereupon, within thirty days, the person to whom said report shall have been referred shall, at some place, to be fixed by him, or by the court, cause said trustee, receiver or other fiduciary to exhibit to him all the securities so reported by said trustee, receiver, or other fiduciary, and ascertain whether the same corresponds with such report or account, and shall also examine and ascertain the correctness of the statements of the report or account with respect to all deposits of money stated in the account or report, as existing when the report or account is filed; and the said person to whom such report or account shall have been so referred shall immediately report to the court the result of such examination and verification, and if such report shall be referred to an auditor, or master, such auditor or master shall be allowed for such service from the income of the trust estate the sum of four ($4.00) dollars, unless for special cause shown, the same is increased by order of the court.

"The trust clerk shall report forthwith to the proper court for its action any delay of thirty days in compliance with this rule by any trustee, receiver or other fiduciary; and the court shall thereupon take such action as it may find desirable looking to the rendering of proper accounts, the protection of the assets and the further administration of the trust."

This rule is evidently directed to the management of trust estates continuing in their nature; and, under it,

will be observed, the court, through regular annual reports, is apprised of where any moneys may be deposited. Comparing this rule with the provisions of Rule 22, it is evident that the latter rule is designed to deal with trusts involving moneys and securities brought into court, the management of which is temporary and passing. It could hardly be urged that in the management of continuing trusts, such as those represented in the instant cases, where life tenants are interested on the one hand and remaindermen on the other, any trustee could intelligently comply with the rule, because it would be impossible for him to report to the court the probable time that the funds in his hands would remain undistributed.

For the purpose of reaching a conclusion in the cases before us, it is extremely unfortunate that Mr. Carey, the trustee, is dead. Had he have lived, it is more than probable that the reasons for his delay in investing the several balances in bank would have been set forth in the record. In the absence of such testimony, our adjudication of his stewardship must be based upon his actions.

As viewed in this light, and in connection with the fact that the economic period in which these deposits were held was both abnormal and perilous, we must, and do conclude, that he did what any other prudent and careful trustee would have done under like conditions and circumstances, and that the failure of the trust company in which he deposited his own uninvested funds and lost them, should not now be the basis of making the *cestuis que trust* whole at the expense of those who happen to be the beneficiaries of his individual estate.

For the reasons above stated, the decrees in these cases will be reversed.

> *Decrees in Nos. 57, 58, 59 and 60 reversed, and cases remanded for further proceedings in accordance with the views herein expressed, with costs to the appellant.*