**NATIONAL SAVINGS AND TRUST CO., Plaintiff-Appellant,**

v.

**PARK CORPORATION, Defendant-Appellee.**

**No. 82–3565.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 4, 1983.

Decided Dec. 19, 1983.

Certiorari Denied April 16, 1984. See 104 S.Ct. 1916.

David A. Nelson (argued), Roy E. Lachman, Squire, Sanders & Dempsey, Cleveland, Ohio, for plaintiff-appellant.

Clarence D. Rogers, Jr., Mark R. Greenfield (lead Counsel), Ricardo B. Teamor (argued), Cleveland, Ohio, for defendant-appellee.

Before KEITH and MARTIN, Circuit Judges, and SPIEGEL, District Judge.*

BOYCE F. MARTIN, Jr., Circuit Judge.

In this diversity action, National Savings and Trust challenges the summary denial of

---

* Honorable S. Arthur Spiegel, United States District Judge for the Southern District of Ohio,     sitting by designation.

its claim for restitution of $74,737.25 it mistakenly paid to Park Corporation on a bad check.

On January 8, 1980, Park Corporation contracted to sell some used mining equipment to DAI International Investment Corporation. The sales agent for the transaction was Garland Caribbean Corporation. As part of its down payment, DAI gave Garland a check for $75,000 drawn on its account with the plaintiff, National Savings and Trust Company. On January 16, Garland called National Savings to determine if DAI had sufficient funds in its account to cover this check. The bank said DAI did not. That same day, Garland endorsed the check over to Park Corporation. Park Corporation then sent the check to National Savings "for collection."

On January 22, Garland once again called the bank to determine if DAI had sufficient funds in its account to cover the check. Once again, the bank said DAI did not.[1] Moreover, on this occasion, the banking employee who received the inquiry went to the bank's "platform officer" and notified him not to accept any DAI checks drawn on insufficient funds. Unfortunately for the bank, the platform officer only saw checks arriving through normal banking channels and not those coming in "for collection."

DAI's check arrived at the bank that same day. However, the employee who normally processed "for collection" checks was scheduled to work in another department that day. Prior to her departure, she did manage to open the incoming mail, including the DAI check. Her supervisor then volunteered to help out by taking the DAI check to the wire room for payment. Neither employee followed the bank's standard procedure and checked DAI's account to ensure that it held sufficient funds to cover the check. Each assumed that the other had done so. As a result, the check was paid even though DAI had only $263.75 in its account.

On January 28, 1980, after discovering its mistake, National Savings asked Park Cor-

poration to return the $75,000. Park refused and National Savings subsequently brought this lawsuit. On motion for summary judgment by the defendant, the court found for Park on the grounds that National Savings had made an improvident extension of credit and that the bank was in a better position to know the true facts and to guard against mistakes. We disagree.

The basic law of restitution in Ohio, the state whose law controls, is summarized in *Firestone Rubber & Tire Co. v. Central Nat'l Bank of Cleveland,* 159 Ohio St. 423, 112 N.E.2d 636 (1953). The *Firestone* case held that money paid to another by mistake is recoverable unless the other person has changed his position in reliance on the payment. This rule applies even if the mistake was the result of negligence.

Park Corporation attempts to circumvent the holding in *Firestone* by arguing that banks are not protected by normal restitutionary principles when they pay an insufficient funds (NSF) check. There is some support for this position. *See, e.g., Spokane & Eastern Trust Co. v. Huff,* 63 Wash. 225, 115 P. 80 (1911); 7 Zollman, *The Law of Banks and Banking* § 5062 (1936). Nonetheless, this rule has not been universally applied, *see, e.g., Manufacturers Trust Co. v. Diamond,* 17 Misc.2d 909, 186 N.Y.S.2d 917, 919 (1959), and Park has not cited, nor have we been able to find, any Ohio cases adopting this rule. Moreover, it is questionable whether such a doctrine, if ever in existence, would survive the subsequent enactment of the Uniform Commercial Code in Ohio and the particular provisions applicable to the facts of the present case.

Park Corporation next argues that *Firestone* does not control because National Savings' payment was not a mistake but rather a knowing extension of credit. Park relies heavily on the New Jersey case of *Demos v. Lyons,* 151 N.J.Super. 489, 376 A.2d 1352 (Law Div.1977). The factual circumstances of *Demos,* however, are quite

---

1. There is no evidence Park was ever aware of Garland's phone conversations with the bank.

distinct from the present case. In *Demos,* the bank actually examined the customer's account, realized the customer had insufficient funds to cover the check, yet paid the check anyway. The bank did not want to embarrass its customer and it hoped that he had made a late deposit to cover the check which would appear on the next day's balance sheet. No such deposit was ever made. In our case, National Savings never intended to make good on an NSF check. The platform officer had been notified not to pay out on DAI's check. The "for collection" employees were operating under standing orders to check balances before paying a check and never to pay on an NSF check. Despite all these precautions, the check was paid. At no time, however, did the employees making the payment decision know that DAI's account had insufficient funds to cover the check.

Park's next contention is that the Uniform Commercial Code as adopted in Ohio bars restitutionary recovery for banks that pay NSF checks. This argument focuses on an apparent conflict between two provisions of the U.C.C., section 3–418 and section 4–213. Section 3–418 of the Code (O.R.C. § 1303.54), which applies to all transactions involving negotiable instruments, states that "payment or acceptance of any instrument is final in favor of a holder in due course, or a person who has in good faith changed his position in reliance on the payment." [2] Because a holder in due course is simply a special type of detrimental relier, this section is basically a codification of restitutionary principles established in *Firestone.* Official Comment 3 to this section makes clear that if there is no detrimental reliance by the payee, then recovery of payment is permitted.

Park Corporation argues that another provision of the U.C.C., section 4–213, establishes a special non-recovery rule for banks which mistakenly pay on a bad check. Section 4–213(1) (O.R.C. § 1304.19(A)) states that "[a]n item is finally paid by a

payor bank when the bank has done any of the following, which ever happens first: (a) paid the item in cash . . . ." Park contends that "finally paid" as used in this section has the same meaning as the "payment is final" language in section 3–418, namely restitutionary recovery is no longer possible. Moreover, because section 4–213 does not have the restrictive provisions which limit coverage to holders in due course or those who detrimentally rely, Park argues that section 4–213 makes a bank strictly liable as soon as it pays on an NSF check.[3] Furthermore, U.C.C. § 4–102 provides that, in case of conflict between Articles 3 and 4, the provisions of Article 4 are to govern. Thus, Park argues, National Savings is barred from recovering the $75,000.

At first glance, Park's argument has a certain appeal. That is not surprising because it is based in large part on the work of White & Summers, whose treatise, *Uniform Commercial Code* (2d ed. 1980), is generally considered the leading authority on commercial transactions. *Id.* at 613–617. Several courts have also reached the same conclusion. *See, e.g., Ashford Bank v. Capital Preservation Fund, Inc.,* 544 F.Supp. 26, 28–29 (D.Mont.1982); *Kirby v. First & Merchants Nat'l Bank,* 210 Va. 88, 168 S.E.2d 273, 275 n. 4 (1969). *Confer Bartlett v. Bank of Carroll,* 218 Va. 240, 237 S.E.2d 115, 119 (1977).

Nonetheless, opinion on the matter is by no means uniform. Other writers, *see* H. Bailey, *Brady on Bank Checks* § 14.20 at 14–32 (5th ed. Supp.1983); B. Clark, *The Law of Check Deposits* § 5.3[3] (2d ed. 1981), and other courts, *see Demos v. Lyons,* 151 N.J.Super. 489, 376 A.2d 1352 (Law Div.1977); *Blake v. Woodford Bank & Trust Co.,* 555 S.W.2d 589, 601–02 (Ky.App. 1977), have argued that banks retain their restitutionary rights with respect to mistaken payment of NSF checks. Our own analysis of the Code convinces us that the latter

---

**2.** Section 3–418 also has special exceptions not applicable here which allow banks and other acceptors and payors to recover where a check has a forged endorsement.

**3.** Park agrees with White & Summers, *Uniform Commercial Code* 617 (2d ed. 1980), that there must be a "good faith" requirement read into section 4–213 so that payors acting fraudulently do not benefit.

group is correct and that section 4–213 does not expand the final payment doctrine to bar recovery by payor banks from payees who have not detrimentally relied. In our analysis, we rely heavily on the official Comments to sections 3–418 and 4–213. While these comments to the Code are not part of enacted law, they are a very helpful guide to construing the meaning of Code provisions. *See In re Augustin Bros. Co.,* 460 F.2d 376, 380 (8th Cir.1972).

An examination of the comments to section 3–418 makes clear both that this section was intended to apply to "the payment of overdrafts, or any other payment made in error as to the state of the drawer's account," Comment 2, and that restitutionary recovery was to be denied only when the payee had relied on the payment. "If no value has been given for the instrument, the holder loses nothing by the recovery of the payment, . . . and it is not entitled to profit at the expense of the drawee. . . ." Comment 3.

The only mention of section 4–213 occurs in Comment 5, where the Code drafters point out that the provisions of section 3–418 do not apply until payment is final as defined in section 4–213. This comment suggests a method for resolving the apparent conflict between section 3–418 and 4–213. As the court in *Demos v. Lyons* put it, section 4–213 "is oriented toward time of payment, not legal effect of payment." 376 A.2d at 1356. The purpose of section 4–213 is "to determine *when* settlement for an item or other action with respect to it constitutes final payment." Comment 1, § 4–213 (emphasis added). Section 4–213 determines *when* the final payment rule of section 3–418 comes into effect, not *what* that rule is supposed to mean. Further support for this position comes from the remaining comments to section 4–213. Comment 1 states "final payment is important" because it helps determine "priorities between items and notices, stop orders, legal process and setoffs, [because it] is the 'end of the line' in the collection process, [and because it] is the point at which many provisional settlements become final." The remaining comments discuss such arcane banking matters as posting, provisional settlements, and mid-

night deadlines. At no point does any comment to section 4–213 mention the effect this section is supposed to have on the restitutionary rights of banks. Thus, it seems evident that the drafters of the Code never intended for section 4–213 to supercede section 3–418, and we can see no reason to adopt a position contrary to that intent.

As further support for our decision, we feel obliged to note that White & Summers, the authorities most relied on for the contrary proposition, now appear to have changed their minds. Professor White, in a note written for a colleague's textbook, has recanted and now supports the view that section 4–213 makes no substantive change in the law of restitution as applied to banks. *See* D. Epstein & J. Martin, *Basic Uniform Commercial Code* 514 (2d ed. 1983). Presumably the next edition of his treatise will reflect this change in thinking.

■ Park Corporation next contends that, even if section 3–418 controls, it is both a holder in due course and one who has changed its position in reliance on National Saving's payment and therefore should be allowed to retain the $75,000. We find no support in the record for either proposition. On the holder in due course issue, Park does not qualify because it did not give value for the check. It was still in possession of the machinery it had contracted to sell to DAI. Although it had promised to deliver the equipment to DAI, such an executory promise does not constitute value. U.C.C. § 3–303, Comment 3. Park Corporation is, of course, no longer required to carry out its promise because DAI has breached its agreement to pay.

As for detrimental reliance, Park contends that it paid $37,500 as a commission to Garland Corporation on the assumption that DAI's check was good. However, Park did not pay Garland until February 13, 1980, two weeks after National Savings had informed Park that it had paid the DAI check by mistake and that it wanted Park to return the money. Section 3–418 only makes payment by the bank final in favor of someone who has "*in good faith* changed his position in reliance on the payment."

Once aware of the insufficiency in funds, Park could not have "in good faith" paid Garland $37,500 in reliance on that check. Park also alleges it paid rent for storing the equipment and painted the equipment in reliance on the payment. There is no evidence to support these allegations.

Accordingly, the decision of the district court is reversed.